# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| EUGENE L. CHERRY,<br><br>         Plaintiff,<br>v.<br><br>SARAH COOPER and CAPTAIN PUSICH,<br><br>         Defendants. | Case No. 14-CV-89-JPS<br><br><br><br>ORDER |

  The plaintiff, Eugene L. Cherry, a prisoner incarcerated at Green Bay Correctional Institution ("GBCI"), proceeds *pro se* in this matter, in which he alleges that his civil rights were violated. (Docket #1). On July 22, 2014, the plaintiff filed a Motion for Summary Judgment. (Docket #18). On September 18, 2014, the defendants filed a Cross-Motion for Summary Judgment. (Docket #23). On December 1, 2014, the defendants filed a Motion to Stay and on December 19, 2014 the plaintiff filed a Motion to Appoint Counsel. (Docket #40 #42). The Cross-Motions for Summary Judgment are now fully briefed and ready for disposition. As discussed in detail below, the Court finds as a matter of law that the defendants are entitled to summary judgment on the First Amendment claims.

1.   FACTUAL BACKGROUND[1]

  The facts of this case are fairly simple and for the most part undisputed.[2] In short, the plaintiff alleges that the defendants violated his

---

[1] The cited facts are from the parties' proposed findings of fact, unless otherwise indicated. (Docket #21 #25, #26).

[2] The parties dispute the defendants' personal involvement in this matter. However, even under the plaintiff's version of the alleged events, the Court still finds in favor of the defendants as a matter of law on the First Amendment claim. Thus, the disputed facts are not material to the Court's ultimate ruling on the cross-motions for summary judgment.

First Amendment rights when they prevented him from receiving a personal letter containing the addresses of numerous potential female pen pals.

The plaintiff, Eugene Cherry, has been incarcerated at GBCI since April 29, 2011. (Pusich Decl. ¶ 6; Cooper Decl. ¶ 5; Ericksen Decl. ¶ 5). Defendant Yana Pusich ("Pusich") has been employed by the State of Wisconsin Department of Corrections ("DOC") as a Supervising Officer 2 (Captain) at GBCI since October 12, 2008. (Pusich Decl. ¶ 2). In addition to her general duties as a Captain at GBCI, Pusich has been the Mailroom Supervisor since January 2013. (Pusich Decl. ¶ 4).

Defendant Sarah Cooper ("Cooper") has been employed by DOC as Deputy Warden of GBCI since August 28, 2011. (Cooper Decl. ¶ 2). In her capacity as Deputy Warden, in the Warden's absence, Cooper is responsible for the overall administration and operation of GBCI. In general, she assists in developing, implementing, and administering the security, treatment, and support services for GBCI. She is also the Reviewing Authority for the Inmate Complaint Review System ("ICRS"). In this capacity, Cooper reviews inmate complaints, the Inmate Complaint Examiner's ("ICE") investigation summary, and the ICE's recommendation in order to decide the outcome of the complaint. (Cooper Decl. ¶ 3).

All GBCI inmate mail is processed in accordance with § DOC 309.04, Wis. Admin. Code, the Division of Adult Institutions Policy Number 309.04.01 entitled "Inmate Mail," and pages 27–30 of the GBCI Inmate Handbook. (Pusich Decl. ¶ 8; Exhibits 1000-1002). Pursuant to § DOC 309.04(2)(a), Wis. Admin. Code, in addition to the GBCI Inmate Handbook, page 27, Number 1, if inmates have agreed to utilize prison mail services, all incoming mail addressed to inmates may be opened, examined, and censored prior to delivery to the inmate. A signed "Consent to Receive Mail" form

(DOC-238) must be on file. (Pusich Decl. ¶ 9; Exhibits 1000, 1002). As outlined in the GBCI handbook, "The department may allow inmates to communicate with their families, friends, government officials, courts, and other people concerned with the welfare of inmates." However, "[s]uch correspondence will be consistent with the need to protect the public and in accordance with DOC Administrative Code 309.04." (Pusich Decl. ¶ 15; Exhibit 1002 at 28, Number 4).

On June 3, 2013, Sergeant Huck, a GBCI Mailroom Sergeant, received a letter postmarked May 24, 2013, addressed to the plaintiff. The mail piece was examined and found to contain contraband because it contained personal contact information pertaining to persons other than the plaintiff or the sender. (Pusich Decl. ¶ 11). The plaintiff has since alleged that it contained addresses of potential female pen-pals. (Docket #1 at 4). On June 3, 2013, Sergeant Huck completed a Notice of Non-Delivery of Mail form (DOC-243), and forwarded a copy of the same to the plaintiff. (Pusich Decl. ¶ 18; Exhibit 1003). The form indicated that mail piece 13060306 addressed to the plaintiff was being denied because it contained contraband. Sergeant Huck noted that it concerned an activity which, if completed, would violate the laws of Wisconsin, the United States or the Administrative Rules of the Department of Corrections; and posed a threat to the security, orderly operation, discipline or safety of the institution. (Pusich Decl. 19; Exhibit 1003).[3]

---

[3] The plaintiff argues that mail piece #13060306 did not contain contraband, nor did it violate laws of Wisconsin, Administrative Rules of the Department of Corrections, nor did it pose a threat to the security or safety of the institution. (Docket #33 at 2). However, this response to defendants' proposed findings of fact fails to dispute what the form itself indicated. As such, there is no dispute as to the contents of the form itself.

On June 5, 2013, the plaintiff completed the bottom portion of the Notice of Non-Delivery form, indicating that the denied mail piece should be held for 30 days pending ICE. (Pusich Decl. ¶ 20; Exhibit 1003). On June 14, 2013, Cherry filed Inmate Complaint Number GBCI-2013-11936, challenging the non-delivery of mail piece 13060306. (Cooper Decl. ¶ 7; Exhibit 1004).[4]

After investigating the plaintiff's complaint, on July 16, 2013, inmate complaint examiner Michael Mohr stated in his summary that the GBCI mail room does not forward mail pieces containing personal information of individuals who are not the sender or receiver because such information is many times used as leverage against the third party. Because he believed GBCI had a penological interest in not delivering such mail, he recommended dismissal of the plaintiff's complaint. (Cooper Decl. ¶ 8; Exhibit 1004 at 5). That same day, July 16, 2013, after reviewing the inmate complaint with Mr. Mohr's recommendation, Cooper dismissed the complaint as the reviewing authority. (Cooper Decl.¶ 9; Exhibit 1004 at 6).

The plaintiff appealed Cooper's decision to the corrections complaint examiner ("CCE") on July 22, 2013. (Cooper Decl.¶ 10; Exhibit 1004 at 7-11). On August 20, 2013, after a review of the relevant materials, CCE Charles Facktor found that the institution appropriately addressed the issue, and that because Cherry provided no additional information on appeal to warrant overturning the initial decision, he recommended that the complaint be dismissed. (Cooper Decl. ¶ 11; Exhibit 1004 at 12). Mr. Facktor's recommendation was accepted by the Office of the Secretary, as signed by

---

[4] The parties dispute whether the plaintiff re-filed the complaint on June 6, 2013. (Docket #36 at 18). This fact, however, is not material to the resolving the First Amendment claim.

Cindy O'Donnell on September 10, 2013. (Cooper Decl. ¶ 12; Exhibit 1004 at 14).

The mail was ultimately destroyed on July 10, 2013. (Pusich Decl. ¶ 21; Exhibit 1003).[5] The plaintiff alleges that he contacted defendant Pusich on June 6, 2013, and again on June 12, 2013. (Docket #36 at 22). As a result of his mail being destroyed, the plaintiff claims that he lost a friend of 23 years and suffered extreme emotional distress as well as chest pains from "heartaches." (Docket #21 at 6). The plaintiff alleges First Amendment violations against Pusich and Cooper for the denial of his mail. (Docket #1 at 4-5).

2. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

---

[5] The parties dispute whether the plaintiff authorized the destruction of the mail. (Docket #36 at 21). However, again, this fact is not material to the issues presented at summary judgment.

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed.R.Civ.P. 56(c)(4).

3. CROSS-MOTIONS FOR SUMMARY JUDGMENT

The plaintiff's Motion for Summary Judgment argues that proposed findings of fact establish that the defendants violated his First Amendment rights as a matter of law. In contrast, the defendants' Motion for Summary Judgment argues that the facts establish that the defendants *did not* violate the plaintiff's constitutional rights as a matter of law. Additionally, the defendants pose alternative arguments in support of summary judgment, including: 1) that the defendants were not personally involved; 2) they are entitled to judgment on the claim for compensatory and punitive damages; 3) that they are entitled to qualified immunity; and 4) that the destruction of the mail was appropriate given that it was deemed dangerous to the public. As discussed below, the Court finds that the defendants are entitled to summary judgment because they did not violate the plaintiff's First Amendment rights as a matter of law. As such, the Court need not address the defendants' remaining arguments for summary judgment.

3.1 Legal Standard–First Amendment

Prisoners "retain those First Amendment rights that are not inconsistent with his status as a prisoner or with legitimate penological objectives of the correctional system." *Pell v. Procunier,* 417 U.S. 817, 822 (1974). Encompassed within a prisoner's First Amendment rights is an

inmate's right to both send and receive mail. *Rowe v. Shake,* 196 F.3d 778, 782 (7th Cir. 1999). When a prison regulation restricts a prisoner's First Amendment right to free speech, it is valid only if it is reasonably related to legitimate penological interest. *Turner v. Safley,* 482 U.S. 78, 89 (1987)*; Lindell v. Frank,* 377 F.3d 655, 657 (7th Cir. 2004); *Kikumura v. Turner,* 28 F.3d 592, 598 (7th Cir.1994).

The Supreme Court has established four factors that courts must consider in determining whether a prison regulation is constitutional: 1) whether the regulation is rationally related to a legitimate and neutral governmental objective; 2) whether there are alternative means of exercising the right that remain open to the inmate; 3) what impact an accommodation of the asserted right will have on guards and other inmates; and 4) whether there are obvious alternatives to the regulation that show that it is an exaggerated response to prison concerns. *Turner*, 482 U.S. at 89–91. The four factors are all important, but the first one can act as a threshold factor regardless which way it cuts. *See id.* at 89–90 ("[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational."); *Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009) ("Where…there is only minimal evidence suggesting that a prison's regulation is irrational, running through each factor at length is unnecessary.").

Inmates who challenge the reasonableness of a prison regulation bear the burden of proving its invalidity. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003); *Jackson v. Frank*, 509 F.3d 389, 391 (7th Cir. 2007). The burden is a weighty one: "We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for

defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton*, 539 U.S. at 132.

3.2 Analysis

With this standard in mind, the Court will apply the *Turner* factors to determine whether the defendants' actions violated the plaintiff's First Amendment rights. As discussed in detail below, the Court finds that the *Turner* factors, and particularly the first factor, weigh heavily in favor of the defendants; thus, the Court finds that the defendants did not violate the plaintiff's First Amendment rights.

First, the Court finds that the denial of mail containing third party personal addresses was rationally related to legitimate penological interests. Prison officials undoubtably have a legitimate interest in protecting the safety and security of the institution. *Bell v. Wolfish*, 441 U.S. 520, 546 (1979) (holding that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of…convicted prisoners"). Thus, the only question is whether the policy at issue is rationally related to protecting this interest. The Court finds that it is. Although the plaintiff argues that defendants do not actually have a policy prohibiting third party contact information from being received by inmates (Pl's Mot. Summ. J. at 8, Docket #19), the defendants have shown otherwise and sufficiently explained the rationale for the policy.

As outlined in the GBCI handbook, "[t]he department may allow inmates to communicate with their families, friends, government officials, courts, and other people concerned with the welfare of inmates." However, "[s]uch correspondence will be consistent with the need to protect the public and in accordance with DOC Administrative Code 309.04." (Pusich Decl.

¶ 15; Exhibit 1002 at 28, Number 4). Pursuant to § DOC 309.04(4)(a), Wis. Admin. Code, incoming and outgoing mail may be opened and inspected for contraband and shall not be delivered if it contains contraband, or if it poses a threat to the security, orderly operation, discipline or safety of the institution, pursuant to § DOC 309.04(4)(c)8.b, Wis. Admin. Code. The GBCI handbook adds that mail also shall not be delivered if it generally violates any of the rules under DOC Administrative Code. (Pusich Decl. ¶ 14; Exhibit 1002 at 28, Number 9).

Although not a specific written policy, Security Director Pete Erickson testified that inmates at GBCI are not allowed to receive mail which contains third party contact information. (Ericksen Decl. ¶ 7). Director Erickson further testified that, when inmates receive lists of contact information of third parties, they have the opportunity to victimize a person that may be susceptible to manipulation from an inmate with criminal intentions. (Ericksen Decl. ¶ 8). The defendants offer a variety of examples to show how third party contact information may be dangerous to the public, including: 1) inmates scamming third parties into providing money or other items which the inmates would not have access to in prison; 2) to find vulnerable people who are willing to assist them in manipulating or circumventing institutional policies by, for instance, using them to obtain contraband; 3) members of the public have also been used as a go-between in order to contact another person with whom the inmate is prohibited from contacting; and 4) an inmate may use a third party, who is not incarcerated, to obtain staff personal information, which the inmate would not have access to while incarcerated. The inmate could then use this information to threaten, or intimidate a staff member into bringing in contraband or "looking the other

way" while the inmate commits rule infractions or crimes within the institution. (Erickson Decl. ¶¶ 9, 11, 12; Pusich Decl. ¶ 16).

The plaintiff must overcome the substantial discretion granted prison officials in determining "appropriate means of furthering penological goals" because they "bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton*, 539 U.S. at 132. The plaintiff argues that the policy is irrational because he was able to get mail containing contact information of others on another occasion. (Pl's Mot. Summ. J. at 8, Docket #19). However, policies do not have to be consistently applied to be rationally related to penological interests. *See Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009) ("Mays's only argument that the prison's censorship was unreasonable is that he had access to other writings and to television shows about prison riots, but the deference we afford permits such seeming inconsistencies."); *Azeez v. Fairman*, 795 F.2d 1296, 1299 (7th Cir. 1986) ("The failure to enforce a rule consistently does not make the rule unconstitutional."). As such, this argument fails to show that the policy is not rationally related to security interests.

Next, the plaintiff argues that the policy is not related to a legitimate interest because he has never been put on mail monitoring or received a conduct report or incident report for using addresses of others as leverage against a third party. (Pl's Opp. at 9, Docket #31). However, the prison is not required to show specific instances of problems to justify a particular restriction. *See Singer v. Frank,* 593 F.3d 529, 536 (7th Cir. 2010) (finding that the question is not whether a prohibited action led to problems in the past, but rather "whether the prison officials are rational in their belief that, if left unchecked, [the prohibited action could] undermine prison security in the

future.") Thus, this argument too fails to establish that the policy is not related to a legitimate interest.

Finally, the plaintiff argues that the policy prohibiting third party contact information is an "exaggerated security concern, neither grounded in fact and reality, nor supported by policy." (Pl's Opp. at 10, Docket #31). However, this conclusory argument is insufficient to overcome plaintiff's burden. The plaintiff has not come forward with any admissible evidence showing that defendants' concern for safety and security is not legitimate and honestly held or that the policy is an exaggerated response to defendants' legitimate concern. As such, the Court concludes that the first *Turner* factor weighs heavily in defendants favor because the regulation is rationally related to a legitimate and neutral governmental objective. Although not necessary, *See Mays*, 575 F.3d at 648, the Court will analyze the remaining *Turner* factors for good measure.

Next, the Court finds that alternative means exist for the plaintiff to exercise his First Amendment rights. As to the second *Turner* factor, the defendants argue that there are certainly other means the plaintiff could utilize to exercise his First Amendment rights. Defendants assert that inmates may write to anyone who writes to them unless directed otherwise by court order or by request of the party to whom the inmate is writing. (Docket #24 at 9). Thus, as an alternative in this instance, the plaintiff's friend could have suggested to the potential pen pals that they initiate correspondence with him. If they chose to do so, the plaintiff would have been allowed to receive the correspondence and write letters to each of them in response. (Ericksen Decl. ¶ 14). Defendants argue that this alternative method would ensure that the potential pen pal were actually willing participants interested in corresponding with an inmate.

Additionally, the plaintiff could also write to someone who has advertised for pen pals. Defendants assert that there exist pen-pal organizations that solicit inmates to write on behalf of people who have registered as someone who wants an inmate pen pal. (Ericksen Decl. ¶ 16). Thus, the Court finds that alternatives exist and therefore the second *Turner* factor weighs in defendants' favor.

The third and fourth Turner factors ask whether accommodation of the asserted constitutional right would have a negative impact on guards, other inmates and the allocation of prison resources; and whether obvious, easy alternatives exist as evidence that the regulation is not reasonable. *See Turner*, 482 U.S. at 90. Here, it appears that the only accommodation would be to allow the plaintiff to receive the third party addresses. However, Security Director Pete Erickson testified that allowing inmates access to third party contact information may negatively impact the guards, inmates and allocation of prison resources if inmates used it to establish relationships and then manipulated people into engaging in activities that circumvent institutional policies, such as providing contraband. (Ericksen Decl. ¶ 11). As noted by the Supreme Court, "[w]hen accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner*, 482 U.S. at 90. As discussed above, the plaintiff fails to offer any admissible evidence to challenge the defendants' assertion. Thus, the Court finds that the third and fourth *Turner* factors weigh in the defendants' favor as well.

In sum, the Court finds that, based upon the undisputed material facts, and after applying the *Turner* factors, the plaintiff has failed to demonstrate that there is a genuine issue of material fact as to whether the

policy at issue in this case was reasonably related to the legitimate penological interests of maintaining security and protecting third parties. Accordingly, the defendants are entitled to summary judgment on plaintiff's First Amendment claims.

4. CONCLUSION

Because the Court finds that the defendants are entitled to summary judgment as a matter of law on the First Amendment claims, the Court need not address the defendants' remaining arguments.[6] *See Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 597 (7th Cir.1997) (finding that when a court determines in a § 1983 case that no constitutional violation occurred, it is unnecessary to consider whether defendants are entitled to qualified immunity).

Accordingly,

IT IS ORDERED that the defendants' Motion for Summary Judgment (Docket #23) be and the same is hereby GRANTED, as more fully described in detail above, and that this action be and the same is hereby DISMISSED on the merits;

IT IS FURTHER ORDERED that the plaintiff's Motion for Summary Judgment (Docket #18) be and the same is hereby DENIED;

IT IS FURTHER ORDERED that the defendants' Motion to Stay All Deadlines (Docket #40) be and the same is hereby DENIED as moot; and

IT IS FURTHER ORDERED that the plaintiff's Motion to Appoint Counsel (Docket #42) be and the same is hereby DENIED as moot.

---

[6] Defendants argue that they are both entitled to summary judgment because neither had any personal involvement in the denial of the plaintiff's mail. The Court notes that material issues of fact exist as to the defendants personal involvement and that summary judgment would not have been granted on that ground alone.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 20th day of January, 2015.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge